## THE NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY v. COMMERCIAL NURSERY COMPANY.

Middle Section. May 5, 1928.

Petition for Certiorari denied by Supreme Court, June 30, 1928.

Fitzgerald Hall and Frank Slemons, of Nashville, and George E. Banks and Walton Whitwell, of Winchester, for plaintiff in error. J. B. Templetón, of Winchester, for defendant in error.

FAW, P. J. This action was brought before a Justice of the Peace of Franklin county, on May 31, 1926, by the railway against the Nursery Company, to recover $85.01 as an unpaid balance of freight

charges on an interstate shipment of a carload of sand. The railway appealed from an adverse judgment of the Justice of the Peace to the circuit court of Franklin county, where the case was tried before the judge, without a jury, and the court found the matters in controversy in favor of the defendant Nursery Company, and dismissed plaintiff's suit at plaintiff's cost.

The court overruled a motion for a new trial seasonably made by the plaintiff, to which action of the court the plaintiff excepted, and prayed, obtained and perfected an appeal in the nature of a writ of error to this court, and has assigned errors here based upon some of the matters presented to the trial court in the motion for a new trial.

The evidence before the trial court (which has been brought up by a bill of exceptions) consisted of a written stipulation of the parties, through their attorneys of record, and the testimony of Harry Nicholson, owner and manager of the Commercial Nursery Company, the defendant below.

For convenience, we will refer to the parties as plaintiff and defendant, respectively, as they appeared on the record in the circuit court.

The aforesaid "stipulation" is in these words:

"It is agreed that on May the 31st, 1923, a shipment was made by the Norway Trading Corporation of Gantt's Quarry, Alabama, same being a shipment of sand, that the net weight of same was 59,100 pounds, that the shipment was routed as directed by the shipper, Norway Trading Company, said shipment was made to the Commercial Nursery Company, of Decherd, Tennessee, and that the shipment was received by said Commercial Nursery Company. That the corrected charges as shown by the published tariff rate which was duly published shows an undercharge of $85.01 was made, that is, the correct charge according to the tariff rate was and should have been $147.69 and there was only paid by the Norway Trading Corporation, the shipper, the sum of $62.68. This shipment was billed collect. The N. C. & St. L. Ry. have requested payment from the shipper, Norway Trading Corporation, but same has not been paid, and the above amount of undercharge is due the plaintiff, as an undercharge on said shipment of sand. This shipment was received at Decherd, Tenn., and was by the agent of plaintiff turned over to defendant without any demand for transportation charges at the time, but demand was made later."

Harry Nicholson testified as follows:

"That he is and has been for a number of years part owner and manager of the Commercial Nursery Company, that he

was owner of same at the time the car of sand was shipped by the Norway Trading Corporation from Gantt's Quarry, Alabama, to his Company in Decherd, Tennessee, and that he received said shipment of sand at Decherd, Tennessee. That at the time the shipment was received by him no demand was made of him for freight but that some time thereafter demand was made of him and he refused to pay same. That since this shipment was received by him and shortly before suit was brought a representative of the Norway Trading Corporation had been to see him and solicited other orders from him but that he had not given them any. That he does not know of his own personal knowledge whether this corporation is solvent or insolvent. That his agreement with the shipper was that the shipper was to pay the freight on the car of sand.''

Through its assignments of error the railway asserts that the trial court erred in overruling its motion for a new trial, for the reasons that (1) ''there is no evidence to support the judgment of the court;'' (2) ''the judgment of the court is contrary to the law governing this case,'' and (3) the court was in error in holding ''in effect, that the plaintiff cannot recover this undercharge, on a prepaid shipment, from the defendant, who has accepted and received the freight, without first showing the insolvency of the consignor.''

It is seen that the facts are undisputed, and the question for decision here is, whether the learned trial judge was correct in his application of the law to the facts.

The trial court correctly held (as shown by his ''memo. opinion'' incorporated in the judgment entry) that ''there is no question but what this was an interstate shipment and that the plaintiff is entitled to collect, in fact must collect, the rate as fixed by the legally filed and published tariff.''

In other words, the trial court recognized the rule announced by the Supreme Court of the United States in numerous cases cited by our Supreme Court in C. C. C. & St. L. Railway Co. v. Southern Coal & Coke Co., 147 Tenn., 433, 441-442 (248 S. W. 297), in support of the statement there made that, ''it is now well settled that where an erroneous rate is quoted and collected, the carrier has to collect the correct freightage even though it result in injury or great hardship to the shipper or consumer (consignee), and the carrier cannot, by its conduct in this respect, estop itself to sue for and recover the lawful amount.''

In the Tennessee case from which we have just quoted it was held that the carrier could collect an unpaid balance of a freight charge from the consignor, although it had theretofore collected a part of the freight charges by filing its claim as a creditor against the bankrupt estate of the consignee (or his assignee).

In the case now before us, the carrier is seeking to collect from the consignee (who was the owner of the shipment, and who received and accepted it) an unpaid balance of the lawful freight charges, where the shipper prepaid a part of the charges and the shipment was "billed collect." Whether it was understood between the shipper and the agent of the carrier at the point of shipment that the shipper was paying all of the freight charges, does not appear. The record is silent on that point. It is shown that the shipper had agreed with the consignee that it would "pay the freight on the car of sand," but it does not appear that the carrier knew of this agreement between the shipper and the consignee.

The trial judge found that "there is proof tending to show the consignor solvent," and, being of opinion that the consignor was primarily liable for the freight charges, he held, in substance, that the plaintiff was not entitled to judgment against the consignee without first showing that the consignor was insolvent, or that the carrier had exhausted its remedy by legal proceedings against the consignor.

We have quoted herein all of the evidence heard on the trial, and it is seen that the only evidence touching the matter of the solvency or insolvency of the shipper is the testimony of Harry Nicholson, wherein he says: "That since this shipment was received by him and shortly before suit was brought a representative of the Norway Trading Corporation had been to see him and solicited other orders from him but that he had not given them any. That he does not know of his own personal knowledge whether this corporation is solvent or insolvent."

In the view we take of the case, as hereinafter stated, the solvency or insolvency of the shipper is not a controlling fact in the decision of this case.

We are treating the Norway Trading Corporation as the "consignor," but the bill of lading is not in evidence, and we do not know whether the Norway Trading Corporation was named in the bill of lading as the "consignor" or not. The Norway Trading Corporation is described in the "stipulation" as the "shipper," but, in view of the agreement between the Norway Trading Corporation and the defendant Nursery Company that the former should prepay the freight charges on the sand, it is, of course, possible that the Commercial Nursery Company was named in the bill of lading as both consignor and consignee. How this fact was, the record does not disclose. However, the case seems to have proceeded below, and seems to be treated in the briefs here, upon the assumption that the "shipper," Norway Trading Corporation, was the "consignor," and we will adopt that theory in our disposition of the case.

We are of the opinion that, in receiving and accepting the carload of sand, the defendant Nursery Company "entered into an original contract to pay, which took the place of the right of the plaintiff to retain the property until the charges were paid, and thereby became bound to pay to the plaintiff the freight charges— not those charges erroneously or illegally computed by the carrier, the consignor or the consignee, but the lawful and correct freight rate as set forth in the schedule or tariff filed in the office of the Interstate Commerce Commission and duly published and posted. The United States statutes, known as the interstate commerce act (Act Feb. 4, 1887, Chap. 104, 24 Stat. at L. 379), made that rate arbitrary, immutable by the agreement, mistake, or artifice of the parties, and not to be departed from. The consignor, consignee, and carrier were alike charged with full knowledge of it and its inescapable force, and it was the rate which the defendant agreed to pay in accepting the goods." Pennsylvania Railroad Co. v. Titus, 216 N. Y. 17, L. R. A. 1916-E, 1127, 1129, approved in Pittsburgh, etc., Railway Co. v. Fink, 250 U. S., 577, 63 L. Ed., 1151, 1153.

The defendant Nursery Company received and accepted the shipment of sand as (and it was) the actual owner thereof, and it then became obligated for any unpaid freight charges thereon. The consignor had paid a part of the charges and, upon the acceptance of the sand by the defendant, as the consignee and owner, the law implied an agreement by the defendant to pay the balance of the freight charges lawfully due. Chicago, etc., Railway Co. v. Greenberg (Minn.), L. R. A. 1918-D, 158, 160.

In such case, "the contract of the consignor and that of the consignee are not considered to be inconsistent with each other; each is an original contract based on sufficient consideration." 4 R. C. L., p. 858, Sec. 310. See also 10 Corpus Juris, pp. 445-446, Sections 699-700.

"Both consignor and consignee were bound to plaintiff for the freight, the former on its express contract, and the latter on its promise implied by its ownership and acceptance of the coal." Coal & Coke Railway Co. v. Buckhannon River Coal & Coke Co. (West Va.), L. R. A., 1917-A 663, 664.

In the case of Pittsburgh, C. C. & St. L. Railway Co. v. Fink, 250 U. S. 577, 63 L. Ed. 1151, 1153, supra, the court said:

"It was, therefore, unlawful for the carrier, upon delivering the merchandise consigned to Fink, to depart from the tariff rates filed. The statute made it unlawful for the carrier to receive compensation less than the sum fixed by the tariff rates duly filed. Fink, as well as the carrier, must be presumed to know the law, and to have understood that the rate

charged could lawfully be only the one fixed by the tariff. When the carrier turned over the goods to Fink upon a mistaken understanding of the rate legally chargeable, both it and the consignee undoubtedly acted upon the belief that the charges collected were those authorized by law. Under such circumstances, consistently with the provisions of the Interstate Commerce Act, the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. Texas & P. R. Co. v. Mugg, 202 U. S. 242, 50 L. Ed. 1011, 26 Sup. Ct. Rep. 628. The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier has the right to charge or the consignee the right to pay. This may be in the present as well as some other cases a hardship upon the consignee, due to the fact that he paid all that was demanded when the freight was delivered; but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation.''

In L. & N. Railroad Co. v. Central Iron & Coal Co., 265 U. S., 59, 68 L. Ed., 900, 904, the court said: ''Under the rule of the Fink case (Pittsburgh, etc., Co. v. Fink, supra), if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later. His liability satisfies the requirements of the Interstate Commerce Act.''

We are of the opinion that, under the controlling authorities, the learned trial judge erred in his conclusions of law upon the undisputed facts of the record. The plaintiff's assignments of error are therefore sustained, and the judgment of the circuit court is reversed. The case having been tried by the court without a jury, this court will render such judgment as the circuit court should have rendered. Judgment will therefore be entered here in favor of plaintiff railway and against defendant Nursery Company for $85.01, and for the costs of the cause in the circuit court and in this court.

We are of the opinion that the facts of the case afford a sufficient predicate for the disallowance of interest to the plaintiff.

Crownover and DeWitt, JJ., concur.